UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 23-cr-358 (JMB/TNL)

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DERRICK JOHN THOMPSON,

      Defendant.

**THE GOVERNMENT'S POST-HEARING RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS SHOW-UP**

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Ruth S. Shnider and Tom Calhoun-Lopez, Assistant United States Attorneys, hereby submits its post-hearing response in opposition to Defendant Derrick Thompson's motion to suppress a show-up identification that was conducted on the night of June 16, 2023.

## BACKGROUND

On the evening of June 16, 2023, a trooper with the Minnesota state patrol observed an SUV speeding on I-35W in Minneapolis. The trooper began following the SUV and observed it weaving across lanes of traffic and ultimately taking an exit towards Lake Street. The SUV then ran a red light at a high rate of speed and crashed into a sedan that was crossing the intersection, killing five young women inside. (*See generally* Transcript of

2/7/24 Motions Hearing ("Tr.") at 12-13). The crash occurred at approximately 10:16 p.m. (Tr. 23). The SUV was later searched by law enforcement and found to contain a gun and various controlled substances, which gave rise to the federal charges in this case. (Tr. 13-14).

Minutes after the crash, once law enforcement had arrived on the scene, a woman who lived nearby gave a statement to MPD Sergeant Joshua Stewart about an individual she saw fleeing the crash scene, who she believed may have been the driver. (Tr. 14, 17-18; *see* Gov. Ex. 1). She described him as a black male, about 6' 2" in height, who was limping and wearing a white t-shirt, a grey skull cap, and "gray-green" pants. (Tr. 18).

Around the same time as the eyewitness was speaking with an officer, Defendant Derrick Thompson was located in a Taco Bell parking lot about a block and a half away. (Tr. 14, 18). His appearance and clothing matched the description given by the witness (which was aired over the radio): Mr. Thompson is a tall black male, and he was wearing a white t-shirt and "camo" print, greyish-green pants. (Tr. 15; Gov. Ex. 5 at 00:30-00:45). He was also sweating profusely, and he had an injury on his forehead – so he was detained for further investigation. (Tr. 15). Mr. Thompson was not wearing a hat, but he wore his hair in dreadlocks that were braided to his scalp and then hung loose to his shoulders. (Tr. 21).

A short time later, at about 10:30 p.m., Sergeant Stewart returned to the eyewitness's home and asked her if she'd come participate in a show-up. He said to her: "We have a guy stopped at the Taco Bell that we think—that may or may not be involved. Would you be willing to come look at him?" The witness agreed. (Tr. 18-19; Gov. Ex. 2 at 00:24-00:34).

About ten minutes later, at 10:40 p.m., MPD Officer Lewis Bady met with the eyewitness to escort her to the show-up. (Tr. 19; Gov. Ex. 3). Officer Bady told the witness: "We may or may not have someone in the back of the squad car that you may recognize." (Tr. 19; Gov. Ex. 3 at 00:00-00:30). The witness was placed into the back of a squad car and driven to take a look at Mr. Thompson. Before the show-up began, another officer asked Officer Bady, in the witness's presence, whether she had been told that the person she would be shown "may or may not be the person." The witness responded, "Okay." (Tr. 20; Gov. Ex. 4 at 00:45-00:55).

The show-up was conducted at about 10:47 p.m., approximately a half hour after the crash. (Tr. 22-23). By this point, Mr. Thompson was detained in handcuffs in the back of a different squad car. That squad was positioned a short distance in front of the car holding the eyewitness, and Mr. Thompson was removed from the backseat and walked to the front of the car, where lights illuminated him for the witness to see. Mr. Thompson remained in handcuffs during this process, and multiple officers were visible in the vicinity, but none

of them had their weapons drawn. (*See generally* Gov. Ex. 4). As Mr. Thompson was being brought out of the backseat, Officer Bady said to the eyewitness: "Ok, ma'am, so we're gonna bring out the suspect—possible suspect—I want you to tell me if you recognize him or not." (Gov. Ex. 4 at 03:10-03:20).

While observing Mr. Thompson, the eyewitness told officers that he was wearing clothing that matched the person she saw, and she indicated that she was looking for a limp. In some moments, she spoke with clear certainty ("That's the one I seen running through my neighbor's driveway, yes . . . I mean my neighbor's yard") and in other moments she expressed less than total certainty ("it was dark," "similar, yes"). She kept asking if the person she was being shown had a limp. (Gov. Ex. 4 at 03:20-05:00). As Mr. Thompson was being returned to the squad car, one of his knees buckled and he clearly displayed a limp. "See?" the witness said, "He can't walk." She then agreed with an officer that she "100 percent saw him running from the crash." (Gov. Ex. 4 at 05:00-05:20).

Shortly after midnight that same night, Sergeant David Ligneel, one of the lead investigators, took a more detailed statement from the eyewitness on her back porch. (Tr. 23; Gov. Ex. 6). The witness explained that she had been retrieving her mail when she heard a loud screeching and "boom," and then saw the SUV "come tumble in front of me. (Gov. Ex. 6 at 00:25-00:35). She

4

explained she was trying to calm her dog at the time so she did not directly observe the male climbing out of the SUV, but she could tell he was "leaving the SUV" and she saw "just one guy." (*Id.* at 00:50-01:10). She described the person she saw as a black male, "6 [foot] plus" in height, and medium build, wearing a white t-shirt, grey-green sweatpants, and a grey beanie cap, with dreadlocks to his shoulders. (*Id.* at 01:10-01:43). She explained that she had initially been at the front of her house and saw the male run between her and her neighbor's house; then she went out her backdoor and observed him running alongside her neighbor's fence and out through the back alley (in the direction of the Taco Bell). (*Id.* at 01:43-02:11; Tr. 23-24). The witness showed the officers where she had been standing on her porch and gestured to where the male had run by her, which looked to be about six feet away. (Gov. Ex. 6 at 02:11-02:24; Tr. 24, 31-32). She was asked about the show-up and she reiterated that the male she was shown looked like the suspect she observed running from the crash, including wearing the same clothes, and that his visible limp was what made her sure it was the same guy. (Gov. Ex. 6 at 02:24-03:15).

## ARGUMENT

"A crime victim's identification of a defendant is admissible unless it is based upon a pretrial confrontation between the witness and the suspect that is both impermissibly suggestive *and* unreliable." *United States v. Pickar*, 616

5

F.3d 821, 827 (8th Cir. 2010) (quoting *United States v. Martinez*, 462 F.3d 903, 901 (8th Cir. 2006) (emphasis in original)). Even an impermissibly suggestive identification is admissible if it is reliable. *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)). For the reasons stated below, this show-up was not impermissibly suggestive and, even if it was, the identification remained reliable. The motion should be denied.

### A. *The Show-Up Was Not Impermissibly Suggestive*

Absent "special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations." *Pickar*, 616 F.3d at 828. Under the Eighth Circuit's standards, Mr. Thompson's handcuffed show-up to the eyewitness at the scene was not unlawfully suggestive. "[N]ecessary incidents of on-the-scene identifications, such as the suspect[ ] being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive." *United States v. Martinez*, 462 F.3d 903, 911 (8th Cir. 2006)).

The Eighth Circuit has repeatedly held that show-ups similar to this one were not impermissibly suggestive. In *Pickar*, the defendant robbed a bank and was apprehended approximately 5 miles away, while he was driving away from the scene. *Pickar*, 616 F.3d at 824. Police brought the defendant back to the bank for a show-up approximately 45 minutes after the 911 call came in. *Id.* The defendant was handcuffed outside of a marked squad car and standing

6

between two police officers. *Id.* at 828. The Court found that this process was not impermissibly suggestive. *Id.* Similarly, in *Martinez*, the Eighth Circuit rejected a claim that the show-up was suggestive where the defendant "was handcuffed, he had been driven to the [crime scene] in a police car, and . . . police officers were present." *Martinez*, 462 F.3d at 911; *see also United States v. King*, 148 F.3d 968, 970 (8th Cir. 1998) (show-up not suggestive where "uniformed police officers lined up four handcuffed suspects thirty-five to forty-five feet from the [stolen] car").

In the present case, the police did not engage in any unconstitutionally suggestive conduct. The eyewitness was told repeatedly that the person detained by police "may or may not" have been involved in the crash. Although Officer Bady did press the witness for some clarity in her answers during the show-up, nothing was said to suggest whether or why the police believed they had the correct person in custody.

*Clark v. Caspari*, 274 F.3d 507 (8th Cir. 2001), cited by the defense, is distinguishable. There, officers had the two suspects "face down while handcuffed" and an "officer with a shotgun stood over them." *Id.* at 509. When the witnesses arrived on the scene, they saw one of them being "hauled to his feet," surrounded by police officers, including the one brandishing a shotgun. *Id.* The witnesses were initially given the impression they would be shown several suspects, but were only shown the two defendants. *Id.* at 511. The

7

court found that this context was "coercive" and observed that the eyewitnesses "may have felt obligated to positively identify Clark and Spears, so as not to disagree with the police, whose actions exhibited their belief that they had apprehended the correct suspects." *Id.*

Here, there was no comparable show of force in relation to Mr. Thompson, nor did the officers "exhibit[] [a] belief" that they had stopped the correct person. The officers who accompanied the witness during the show-up exhibited genuine, albeit urgent, curiosity about whether the witness recognized Mr. Thompson as the person she saw. Indeed, the fact that both before and after the show-up the witness said that the suspect she saw was wearing a hat, notwithstanding that Mr. Thompson was not, confirms that she was not pressured into giving any particular answers. The circumstances did not rise to a level of suggestiveness that might warrant suppression; the defense remains free to probe those circumstances and the accuracy of the identification at trial.

### B. The Show-Up Was Reliable

Even if the show-up in this case was unduly suggestive, it was abundantly reliable, and therefore should not be suppressed. In assessing the reliability of an identification, a court looks at "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty

8

demonstrated at the confrontation, and the time between the crime and the confrontation." *United States v. Williams*, 340 F.3d 563, 567 (8th Cir. 2003) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

In this case, the witness observed the suspect at a distance of less than a few yards, immediately after the crash, and gave her first statement to an officer mere minutes later, when it was fresh in her mind. The show-up was conducted only half an hour later. Although it was nighttime when she observed the suspect, the witness was clear and consistent about the details of his physical appearance, including race, height, and clothing—thus confirming that she got a good look at him. Importantly, the witness's description of the suspect she saw running matched several key features of Mr. Thompson's appearance. And it was clear that Mr. Thompson's limp—a visible detail as distinguishing as a unique hairstyle or piece of clothing—confirmed for the eyewitness that Mr. Thompson was the suspect she saw. All these facts render the identification sufficiently reliable. *See Martinez*, 462 F.3d at 911 ("Given [the teller's] opportunity to clearly observe the robber, [her] direct dealing with him at the time of the offense, [her] prior description of the robber, the certainty of [the] identification, and the short time between the robbery and his identification, the show-up identification was reliable." (cleaned up)).

Mr. Thompson argues that the witness did not adequately explain why she believed the person she saw was the *driver* of the SUV. (ECF No. 35 at 4).

But that nuance is irrelevant to this motion. The only question is whether the witness properly identified Mr. Thompson as *the person she saw running alongside her house*, immediately after the crash. Any remaining questions about that person's role in the crash, or the strength of the identification, are properly left for the jury. *See Perry v. New Hampshire*, 565 U.S. 228, 245 (2012) (noting "our recognition that the jury, not the judge, traditionally determines the reliability of evidence").

## CONCLUSION

For the foregoing reasons, the defendant's motion to suppress the show-up identification should be denied.

Dated: March 20, 2024

Respectfully Submitted,

ANDREW M. LUGER
United States Attorney

*/s/ Ruth S. Shnider*
BY: RUTH S. SHNIDER
TOM CALHOUN-LOPEZ
Assistant U.S. Attorneys