UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-358 (JMB/TNL)

UNITED STATES OF AMERICA,

Plaintiff,

v.

DERRICK JOHN THOMPSON,

Defendant.

**GOVERNMENT'S POSITION ON SENTENCING & MOTION FOR UPWARD VARIANCE AND/OR DEPARTURE**

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and LeeAnn K. Bell, Assistant United States Attorneys, hereby respectfully submits its position on sentencing with regard to Defendant Derrick Thompson. Mr. Thompson murdered five young women in the course of possessing a firearm and deadly fentanyl that he intended to sell. His actions have inflicted immeasurable grief on the scores of people who knew and loved the victims, and his actions followed on a prior conviction for alarmingly similar conduct. Given the aggravated context of his offenses, the Court should vary and/or depart upward significantly, and impose a sentence of 360 months in prison. Further, the law requires that, because Thompson was convicted under 18 U.S.C. § 924(c), at least 60 months must run consecutive to the related homicide sentence imposed in Hennepin County.

1

## BACKGROUND & PRESENTENCE INVESTIGATION

On October 11, 2024, following a four-day trial, a jury found Derrick Thomson guilty of (1) Possession with Intent to Distribute 40 Grams or More of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); (2) Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8); and (3) Carrying a Firearm During and in Relation to a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  Count 1 carries a five-year mandatory minimum sentence, and Count 3 carries an additional five-year mandatory *consecutive* sentence.

The Court undoubtedly remembers the key facts and evidence from trial, and thus the Government will be relatively brief here.  On the evening of June 16, 2023, Mr. Thompson rented a Cadillac Escalade from the airport Hertz. Shortly after 10 p.m., a state trooper clocked Thompson's Escalade going 95 miles per hour down I-35W toward downtown Minneapolis, well over the posted speed limit.  The trooper pulled out and tried to catch up to Thompson, but did not activate his lights or sirens.  Traffic camera footage captured the trooper gaining ground on the Escalade, and Thompson then weaving around vehicles and abruptly taking the Lake Street exit.  After exiting the freeway, in the densely populated Philips neighborhood, Thompson flew threw a red light at the intersection of Lake Street and Second Avenue and plowed into a Honda Civic sedan that was lawfully crossing the intersection on a green light.

Inside the Honda were five girls, ages 17 to 20, who were running errands together in preparation for a friend's wedding.  All five girls were killed in the crash.

After crashing into the Honda, Thompson's Escalade rolled and came to a stop nearby.  Thompson emerged and ran from the vehicle but was spotted by several witnesses and ultimately located by Minneapolis Police at a nearby Taco Bell—bleeding from the head and limping with a broken hip.  He initially lied about the source of his injuries, first claiming they were old, then claiming he fell nearby.  No one bought it.  Thompson was held in a squad at the scene and, as he waited, he repeatedly remarked to officers that he did not want his entire Friday night wasted.  Officers found the Hertz rental receipt on the ground near the Escalade in Thompson's name, and conducted a "show up" with an eyewitness, who confirmed Thompson's identity as the driver.  He was arrested and taken to the hospital for treatment.

The Escalade was ultimately towed from the crash scene to the Minneapolis Police Department's evidence garage, where Sgt. David Ligneel got a warrant to search it.  On the front passenger floor, officers recovered a black leather bag that contained a loaded Glock handgun with an extended magazine, and various controlled substances, including over 2,000 blue pills containing fentanyl, about 14 grams of powdered fentanyl, about 35 grams of

cocaine, and several assorted multi-colored pills.   Officers recovered a digital scale and a total of three cell phones from the Escalade.

Thompson's DNA was later identified on several key items, including the interior driver's side door of the Escalade; the grip and textured areas of the gun; the bag opening of the fentanyl powder; and the bag knot from the cocaine. All three cell phones were searched, and it appeared one was used primarily by Thompson, one by his brother Damarco,[1] and one by both brothers.  They all had drug texts on them.   For example, on the phone most clearly attributable to Thompson, the jury saw a variety of text exchanges where Thompson arranged drug sales or purchases of "blues" (fentanyl pills), "china" (powdered fentanyl or heroin), and "white girl" (cocaine).   The phone also contained evidence that a handful of days before the crash, Thompson flew out to Arizona and, while there, exchanged voice notes with a drug supplier where Thompson, his voice clear as a bell, requested "30K blues" and a "half" of

---

[1]     During the federal trial, the Government argued to the jury that it appeared Damarco was riding passenger in the Escalade at the time of the crash, but that the black bag full of contraband belonged to Derrick. Defense counsel argued that Damarco was indeed riding passenger in the Escalade, closer to where the black bag was found, and that this fact suggested the bag and its contents belonged to him. In the Hennepin County trial, state defense counsel argued that Damarco was *driving* the Escalade, though Damarco was compelled to testify and said he and Derrick parted ways in separate vehicles prior to the crash. Ultimately, none of this matters. Juries have now found Derrick Thompson guilty both of driving the Escalade, and possessing the contraband.

another substance. Also on Thompson's phone were multiple photos of him carrying the same bag the gun and drugs were found in. The jury also saw security camera footage from the airport Hertz where Thompson could be seen arriving with the black bag strapped across his chest.

After the federal conviction, Thompson stood trial in Hennepin County for various homicide-related crimes arising from the crash. On June 6, 2025, the Hennepin County jury found him guilty of all counts, the most serious of which were five counts of Third-Degree Murder, leaving no remaining doubt about who was driving the Escalade. On July 24, 2025, the Hennepin County District Court sentenced him to a total of 704 months in state prison.

The United States has reviewed the Presentence Investigation Report ("PSR") prepared by the U.S. Probation Office. As set forth in more detail below, the Government objects to the PSR's Guidelines calculations in one respect: Thompson should receive a two-level upward adjustment for Reckless Endangerment During Flight, under U.S.S.G. § 3C1.2. Beyond that issue, the Government has no other objections to the PSR.

As summarized in the PSR, Thompson received 14 criminal history points—though this number is now 17 given the recent conviction and sentence in Hennepin County. He is in any event a Category VI. (PSR ¶ 45). His encounters with the criminal justice system began when he was only 15 years old, and he incurred several juvenile adjudications. (PSR ¶¶ 28-32). His adult

criminal history includes several convictions that bear similarity to the instant offenses including, in Minnesota, a gross misdemeanor gun conviction (PSR ¶ 36); two convictions for fleeing from law enforcement (PSR ¶¶ 38, 40), and a felony fifth degree drug conviction (PSR ¶ 39).  But, of course, the most striking aspect of Thompson's criminal history is his conviction for several offenses in California.  There, in the fall of 2018, Thompson was driving a rental vehicle when he fled from police and struck a pedestrian, severely injuring her (including severe brain trauma that put her into a coma for twenty days).  Thompson then fled on foot, and over 8 kilograms of marijuana were found in the car.  Thompson pleaded guilty in 2020 to Evading an Officer Causing Injury; Leaving the Scene of an Accident that Resulted in Permanent Injury; and Conspiracy to Possess Marijuana for Sale.  He had been released from California prison about six months prior to the instant offense and was still on supervision at the time.  (PSR ¶ 41).

### GOVERNMENT'S PSR OBJECTION: RECKLESS ENDANGERMENT DURING FLIGHT

The Government has always believed that the evidence shows a clear causal connection between the federal drug and gun charges, and the tragic deaths of the five young women in this case.  In the Government's view, the evidence supports the inference that Derrick Thompson was speeding down I-35W, he saw the state trooper pull out behind him, and he knew that if he got

pulled over, the cop might find the illegal drugs and firearm that Thompson had with him in the Escalade.  So Thompson fled.  He increased his speed, he weaved around other vehicles, he abruptly exited the freeway at Lake Street, and he sped through that red light in an effort to evade being pulled over.  In the Government's view, there is simply no other reasonable explanation for why Thompson drove the way he did.  In the lead up to the federal trial, based on a review of the facts that was necessarily limited by the scope of the federal charges and the procedural posture of a motion in limine, the Court disagreed and disallowed the Government from arguing that inference to the jury.

The Government now respectfully urges the Court to reconsider for purposes of sentencing.  In support, the Government offers Exhibit 1, submitted herewith, which are the special findings (so-called "*Blakely* factors") that the jury in Hennepin County was asked to return, based on a standard of proof beyond a reasonable doubt, after rendering its initial guilty verdicts against Thompson.  That jury, of course, heard extensive evidence about Thompson's driving conduct and the state patrol crash reconstruction.  Based on that evidence, the jury specifically found, for example, that Thompson was "weaving between cars on I-35W"; had reached a speed of 110 miles per hour at the time he took the Lake Street exit; and was still driving "at a speed between 75 to 85 miles per hour at the moment of impact," notwithstanding

the "clearly posted" speed limit of 20 miles per hour in that area. (Gov. Ex. 2 at 1-3). The Hennepin County jury also specifically found the following:

> Was the defendant driving evasively to avoid being pulled over by the State Trooper?
>
> ___✓___ Yes
>
> _____ No

Importantly, during the Hennepin County trial, the judge precluded the prosecution from making any reference to the firearm and controlled substances found in the Escalade. In other words, the Hennepin County jury made its finding that the defendant was fleeing law enforcement *without even hearing the evidence that provides the clearest motive for doing so*. With the drug and gun evidence in mind, the inference of flight is even stronger.

Because a jury of Thompson's peers, charged with hearing extensive evidence about the causes and effects of this tragic crash, specifically found that he was fleeing law enforcement, the Government respectfully requests that the Court do the same and apply the two-level adjustment under U.S.S.G. § 3C1.2. Thompson's total offense level should be 28 and his Guidelines range 140 to 175 months in prison (plus 60 months consecutive). (*See* PSR Addendum).

## THE APPROPRIATE SENTENCE

The primary question before the Court is what constitutes a fair and just sentence in this case, in light of the factors set forth in 18 U.S.C. § 3553(a). Although the Government acknowledges that the federal charges did not themselves impose liability for the deaths, the Government nonetheless believes that nothing short of 360 months in prison would take proper account of all the aggravating factors in Thompson's conduct and history.

Even viewed narrowly, Thompson's offense conduct was serious and brazen. Fresh out of prison for serious felony convictions that arose from drug trafficking, Thompson came back to Minnesota and almost immediately started trafficking drugs again – this time, escalating to sales of deadly fentanyl. The evidence received from his cell phone made clear that he was not a small-time player in the drug market; he had connections in Arizona that could supply him with thirty thousand blue fentanyl pills at a time, and Thompson often resold those pills to other drug dealers in quantities of hundreds or thousands. While doing so, he armed himself with a loaded gun with an extended magazine. This conduct makes clear that Thompson has absolutely no respect for the law, has no respect for the safety of his community, and is not easily deterred from reoffending. A serious sentence is warranted.

But Thompson's conduct should not be viewed narrowly, even in this federal proceeding. In the course of engaging in his armed drug dealing,

Thompson killed five young women in the prime of their lives. Even if this Court does not accept the premise that Thompson's possession of contraband was a direct causal factor for the crash, a sentence significantly above the Guidelines is warranted to take account of the homicides. The Eighth Circuit has affirmed "substantial upward variances" based on serious criminal conduct committed by the defendant, even where the conduct was not charged in the federal proceeding and even where it was "unrelated to the offense of conviction." *United States v. Ross*, 29 F.4th 1003, 1009 (8th Cir. 2022) (collecting cases). Here, through any lens, Thompson's killing of the five girls was closely intertwined with his federal crimes and should be taken into account in his federal sentence.

The depravity and callousness of Thompson's conduct on June 16, 2023 cannot be overstated. Regardless of his reasons for speeding, it is difficult to imagine the disregard for human life that was required for Thompson to career through that red light on a summer Friday evening in one of the most densely populated parts of the metro area. Even after pulverizing the Honda, Thompson thought no better of his actions: he didn't stop for a moment to check on the Honda's occupants, and instead fled the scene, and then lied about what happened to everyone he spoke with for the rest of the night. He openly lamented the ruining of his Friday night plans.

Because the federal trial did not focus on liability for the deaths, limited images were presented to the jury of the crash scene. The Government will submit to chambers under separate cover, as Government's Exhibit 2, a selection of photos of the crashed Honda, which the Court may review at its option. These images represent what an arriving first-responder likely would have seen when walking around the Honda. These images are distressing and unforgettable. But the Government believes they are important to view, in order to appreciate the full weight of the defendant's actions and culpability, and the impact not only on the victims and their families, but on the broader community. To a person, from grizzled homicide cops to trained medical personnel, everyone that encountered this crime scene was left traumatized and heartbroken. The deep and lasting community impact of these events is appropriate for the Court to consider at sentencing.[2]

The violence in this case was so sudden, so unforeseen to the victims, so randomly inflicted, that is it tempting to call this a senseless tragedy. But that phrase fails to capture the defendant's agency in that violence. There was exactly one person who had the power to prevent this: Derrick Thompson. And there was perhaps no one else on the planet with more insight into the risks of his reckless driving conduct than Derrick Thompson. He had done this before.

---

[2]     The Government will move to seal this exhibit from public disclosure.

Although Thompson did not take that exit with a purpose to harm anyone, it is difficult to imagine a "car accident" that comes closer to knowing and intentional conduct that this one. The Hennepin County jury verdict on the murder charges confirms that to be the case.

In light of these aggravating factors, the Government seeks a sentence of 360 months in prison. This sentence is warranted as either or both a departure and a variance. The Court may depart upward based on the presence of circumstances of a kind or to a degree that were not adequately taken into consideration in determining the applicable Guideline range (U.S.S.G. § 5K2.0(a)(2)-(3))—namely, the defendant's killing of the five young women. And § 5K2.1 further specifies that if death resulted from the defendant's conduct, an upward departure may be appropriate. In determining the amount of departure, the court should examine factors such as "the defendant's state of mind," "whether multiple deaths resulted," "the dangerousness of the defendant's conduct," and "the extent to which death or serious injury was intended or knowingly risked." Here, Thompson flagrantly disregarded the risks caused by his extremely dangerous driving conduct and, as a direct result, five victims died. Even if the Court applies the two-level reckless flight enhancement, the Guidelines range for the counts of conviction takes woefully little account of the full harm caused by the defendant's actions. Cases such as this are what upward departures were made for. For similar

reasons, the sentence is supported as an upward variance under the § 3553(a) factors. *See United States v. Richart*, 662 F.3d 1037, 1048 (8th Cir. 2011) (ultimately, the distinction between an upward variance and departure is "immaterial" where "the district court appropriately considered and explained the relevant § 3553(a) factors").

The Government is mindful that Thompson already faces a significant sentence imposed in Hennepin County for the homicide charges. But there will presumably be a lengthy appeal process in state court, of which no one can predict the result with certainty. This Court's sentence should stand on its own ground. A sentence of 360 months in federal court strikes the right balance between the severity of all the defendant's conduct, with the reality that the counts of conviction are for drug trafficking and firearm possession (not homicide).

Finally, the law requires that the Court order that at least 60 months of the sentence run consecutive to the state sentence. The charge of carrying a firearm during and in relation to drug trafficking, under 18 U.S.C. § 924(c), reflects a congressional judgment that the special dangers posed by armed drug dealing warrant a consecutive sentence of at least five years. As the statute specifies: "no term of imprisonment imposed on a person under this subsection shall run concurrently with *any other term of imprisonment* imposed on the person." 18 U.S.C. § 924(c)(1)(D)(ii) (emphasis added). The Supreme Court

13

has squarely held that "that the plain language of 18 U.S.C. § 924(c) forbids a federal district court to direct that a term of imprisonment under that statute run concurrently with any other term of imprisonment, *whether state or federal*." *United States v. Gonzales*, 520 U.S. 1, 11 (1997). Given the defendant's § 924(c) conviction, this Court is thus required to order at least 60 months of its sentence to run consecutive to the state sentence. There is no injustice in this outcome. Thompson's federal conviction is for serious, dangerous conduct that wasn't even heard during the state trial, and it is entirely appropriate that the defendant will face a modest amount of consecutive time as a penalty for that conduct.

## CONCLUSION

For all the foregoing reasons, the United States respectfully recommends that the Court impose a sentence of 360 months in prison, with at least 60 months imposed to run consecutive to the Hennepin County sentence, followed by 3 years of supervised release.

Dated:  March 4, 2026                              Respectfully submitted,

                                                   DANIEL N. ROSEN
                                                   United States Attorney

                                                   /s/ *LeeAnn K. Bell*
                                                   BY:  LEEANN K. BELL
                                                   Assistant U.S. Attorneys

14